UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Crim. No. 16-334 (JNE/KMM)

UNITED STATES OF AMERICA,    )
)
         Plaintiff,     )
)
        v.         )    PLEA AGREEMENT AND
)    SENTENCING STIPULATIONS
2.  JOHN L. STEELE,     )
)
        Defendant.   )

The United States of America and John L. Steele (hereinafter referred to as the "defendant") agree to resolve this case on the terms and conditions that follow.   This plea agreement binds only the defendant and the United States Attorney's Office for the District of Minnesota and the United States Department of Justice Computer Crimes and Intellectual Property Section.   This agreement does not bind any other United States Attorney's Office or any other federal or state agency.

1.    **Charges**.   The defendant agrees to plead guilty to Count 1 of the Indictment, charging him with Conspiracy to Commit Mail Fraud and Wire Fraud in violation of 18 U.S.C. §1349, and Count 17, charging him with Conspiracy to Commit Money Laundering in violation of 18 U.S.C. § 1956(h).   If at the time of sentencing the defendant has complied with the terms of this agreement, any remaining counts will be dismissed.

2.    **Factual Basis**.   The Defendant admits the following facts and, where the defendant lacks direct knowledge, the defendant acknowledges that the government has


SCANNED
MAR 0 6 2017
U.S. DISTRICT COURT MPLS

sufficient evidence to prove beyond a reasonable doubt the following facts, all of which constitute the factual basis for this plea:

Beginning in about 2011 and continuing until about 2014, defendant John L. STEELE and co-defendant Paul Hansmeier executed a scheme to fraudulently obtain millions of dollars in copyright lawsuit settlements by deceiving state and federal courts throughout the country.  The defendants—both lawyers—used sham entities they controlled to obtain copyrights to pornographic movies, some of which they filmed themselves.  The defendants then uploaded the movies to file-sharing websites hoping to lure people into downloading their movies.  When STEELE and Hansmeier ensnared someone in their trap, they filed false and deceptive copyright infringement lawsuits that concealed their role in distributing the movies, as well as their significant personal stake in the outcome of the litigation.  After fraudulently inducing courts into giving them the power to subpoena internet service providers and thereby identify the subscriber who controlled the IP Address used to download the movie, the defendants used extortionate tactics to garner quick settlements from individuals who were unaware of the defendants' role in uploading the movie, and often were either too embarrassed or could not afford to defend themselves. When these individuals did fight back, the defendants dismissed the lawsuits rather than risk their scheme being unearthed.  After courts began limiting the number of people that STEELE and Hansmeier could sue in one lawsuit, they changed tactics and began filing lawsuits falsely alleging that computer systems belonging to certain of their sham clients had been "hacked" and recruited ruse defendants to fraudulently

obtain authority from courts to subpoena internet service providers.   Furthermore, when courts began questioning the defendants' tactics, the defendants repeatedly lied and caused others to lie to courts in order to conceal the true nature of their scheme.   The defendants also caused interstate mailings and wire transmissions to be conducted in furtherance of the scheme to defraud.

### Initial Copyright Infringement Lawsuits Brought by Defendants

Beginning in or about September 2010, STEELE and Hansmeier—using the law firm Steele Hansmeier PLLC—began representing individuals and entities that owned copyrights to pornographic movies.   Defendants and their agents monitored file-sharing websites and obtained IP Addresses of individuals who downloaded or attempted to download their clients' movies.   Defendants then filed copyright infringement lawsuits against these anonymous individuals, sometimes referred to as "John Does," and sought authority from the court—often referred to as "early discovery"—to subpoena internet service providers for subscriber information associated with the IP Addresses.

After receiving the subscriber information, defendants engaged in aggressive settlement tactics.   Defendants made phone calls and sent letters to the subscribers associated with targeted IP Addresses in which they threatened overwhelming financial penalties—the copyright statute permits plaintiffs to recover damages of up to $150,000 per infringement—and public disclosure unless the purported infringers agreed to pay a settlement of approximately $3,000.   Many of the individuals who received the defendants' letters and phone calls agreed to pay the settlement rather than incur the

3

expense of defending the lawsuit—which would undoubtedly exceed the settlement amount—or risk being publicly shamed for allegedly downloading pornographic movies.

## Uploading Clients' Movies to File-Sharing Websites

Beginning no later than in or about April 2011, defendants caused P.H. to upload their clients' pornographic movies to BitTorrent file-sharing websites, including a website named the Pirate Bay, without their clients' consent in order to entice people to download the movies and make it easier to catch those who attempted to obtain the movies. As defendants knew, the BitTorrent websites to which they uploaded their clients' movies were specifically designed to aid copyright infringement by allowing users to share files, including movies, without paying any fees to the copyright holders. Thus, defendants knowingly caused their clients' movies to be shared and distributed on BitTorrent websites, and thereby purposely allowed and authorized the BitTorrent users to obtain their clients' movies.

Thereafter, despite colluding in the purported infringement of their clients' copyrights, STEELE and Hansmeier caused lawsuits to be filed disingenuously alleging that the individuals who purportedly downloaded the movie did so "without authorization" or consent from the copyright holder or its agents.

For example, on or about April 1, 2011, P.H. uploaded a movie named "Sexual Obsession," which was owned by a client of the defendants named Heartbreaker Productions, to the Pirate Bay. On or about April 28, 2011, after catching approximately 71 IP Addresses engaged in downloading the movie Sexual Obsession, which defendants

had caused to be uploaded, the defendants filed a lawsuit in federal court in Illinois on behalf of Heartbreaker Productions misleadingly alleging that the 71 "John Does" had downloaded the movie without "authorization or license" from Heartbreaker Productions. This allegation was false and misleading because the defendants had implicitly authorized the downloading activity by placing the movie on the file-sharing website for the purpose of causing the defendants to download the movie.   On or about April 29, 2011, the defendants filed an *ex parte* motion seeking to obtain early discovery regarding the identities of the subscribers associated with the 71 IP Addresses, and therein falsely and misleadingly represented to the court that the John Does "without authorization[] used an online peer-to-peer ("P2P") media distribution system to download Plaintiff's copyrighted works and distribute Plaintiff's copyrighted works to the public ... by making Plaintiff's copyrighted works available for distribution to others."   After obtaining authority to subpoena internet service providers for subscriber information associated with the 71 IP Addresses, the defendants dismissed the lawsuit in order to "engage in settlement efforts or, if necessary, [file] separate actions."

Thereafter, between April 2011 and approximately December 2012, defendants STEELE and Hansmeier caused at least approximately 200 fraudulent copyright infringement lawsuits to be filed in courts throughout the country seeking subscriber information associated with more than 3,000 IP Addresses based on the spurious allegation that certain IP Addresses were caught illegally downloading either Sexual Obsession or another movie owned by Heartbreaker Productions named "Popular Demand" from the

Pirate Bay or other BitTorrent websites, which defendants themselves had uploaded and made available for people to download.   After filing each of the fraudulent lawsuits, STEELE and Hansmeier filed or caused to be filed *ex parte* motions for early discovery that failed to disclose their involvement in uploading the copyrighted movies, and falsely accused the purported downloader of obtaining the movie without authorization or consent. Courts throughout the country, relying on the false and misleading representations made or caused to be made by the defendants, granted early discovery and thereby authorized the defendants to subpoena internet service providers for subscriber information associated with the IP Addresses set forth in the motions and/or civil complaints.

After receiving the subscriber information, STEELE and Hansmeier employed the same tactics they previously used in order to garner quick settlements from the subscribers they identified.   However, defendants falsely represented to the subscribers that they and their clients had legitimate copyright infringement claims against the subscriber when, in fact and as defendants knew, they had uploaded to the BitTorrent website the very movie that they now threatened to sue the subscriber for downloading.   By lying to courts in order to obtain subscriber information and deceiving the subscribers, defendants fraudulently obtained numerous settlement payments.

### Defendants Attempt to Obscure Their Involvement in the Scheme

In or about November 2011, in order to distance themselves from the fraudulent copyright infringement lawsuits and any potential fallout, defendants caused Prenda Law to be created.   Although P.D.—an attorney located in Chicago—nominally owned Prenda

Law, STEELE and Hansmeier often exerted *de facto* control over Prenda Law, including the primary direction of its employees and dispensation of its finances.   Despite controlling Prenda Law, and at various times filing appearances for or in connection with Prenda Law, STEELE and Hansmeier on multiple occasions falsely denied to various courts any direct involvement with or control over Prenda Law.   Beginning in or about 2013, defendants at times also used the name Anti-Piracy Law Group, which was nominally controlled by P.D., to pursue their copyright infringement and associated litigation.

Beginning in or about 2011, defendants also created and/or employed various sham entities, including AF Holdings LLC, Ingenuity 13 LLC, Guava LLC, Livewire Holdings LLC, and LW Systems LLC as plaintiffs or otherwise to further their fraudulent copyright lawsuits.

a.   **AF Holdings.**   In or about 2011, defendants convinced R.R., the owner of Heartbreaker Productions, to transfer the copyrights to Sexual Obsession and Popular Demand to AF Holdings.   In order to disguise their control over AF Holdings, defendants used the name of an acquaintance of STEELE—whose initials are A.C.—on the copyright transfer agreement to purportedly sign on behalf of AF Holdings. Furthermore, defendants represented and caused to be represented to multiple courts that AF Holdings was owned by a trust named "Salt Marsh" whose manager and sole beneficiary was M.L., a paralegal employed by STEELE and Hansmeier.   In fact, and as defendants knew, M.L. was nothing more than a figurehead who agreed to pose as the

owner of AF Holdings in order to help STEELE and Hansmeier obscure their ownership and control over the company.

      b.    **Ingenuity 13.**  Defendants caused Ingenuity 13 to be formed, and beginning in about 2011, defendants used Ingenuity 13 to obtain copyrights over pornographic films, some of which they filmed themselves.  Thereafter, defendants caused copyright infringement lawsuits to be filed on behalf of Ingenuity 13.  Defendants at times used A.C.'s name to sign on behalf of Ingenuity 13, and on other occasions falsely represented that Ingenuity 13 was owned or controlled by M.L.; in fact, Ingenuity 13 was at all times controlled by the defendants, and the defendants received the proceeds of settlement payments generated by lawsuits filed on behalf of Ingenuity 13.

      c.    **Guava.**  Defendants caused Guava to be formed, and beginning in about 2012, defendants used Guava to file lawsuits alleging that computer systems belonging to Guava had been hacked into, and seek early discovery regarding IP Addresses they falsely alleged had participated in the hacking activity.  Defendants at times falsely represented that Guava was owned or controlled by M.L.; in fact, Guava was at all times controlled by the defendants.

      d.    **Livewire Holdings / LW Systems.**  Defendants caused Livewire Holdings and LW Systems to be formed, and beginning in about 2013, defendants used Livewire and/or LW Systems to file lawsuits alleging that computer systems belonging to or associated with those entities had been hacked into, and seek early discovery regarding IP Addresses they falsely alleged had participated in the hacking activity.  Defendants at

times falsely represented that Livewire and LW Systems were owned or controlled by M.L.; in fact, those entities were at all times controlled by the defendants.

### Defendants Film Their Own Pornographic Movies and Upload Them to File-Sharing Websites

Beginning no later than in or about May 2012, defendants filmed and caused to be filmed pornographic movies in order to further their fraudulent scheme.   On at least three separate occasions in Chicago, Miami, and Las Vegas, STEELE and Hansmeier —at times assisted by P.D., M.L., and P.H.—contracted with adult film actresses and produced multiple short pornographic films.   Afterwards, STEELE and Hansmeier caused Ingenuity 13 to obtain copyrights to the films, which bore names such as "Five Fan Favorites" and "A Peek Behind the Scenes at the Show."   STEELE and Hansmeier made no legitimate effort to publicly distribute or commercially release the movies they filmed.   Instead, Hansmeier instructed P.H. to upload the movies to file-sharing websites such as the Pirate Bay in order to catch, and threaten to sue, people who attempted to download the movies.

When STEELE and Hansmeier caught people downloading their movies, they then caused fraudulent copyright infringement lawsuits to be filed in various courts throughout the country, which falsely alleged that certain "John Does" had downloaded Ingenuity 13's movies "without Plaintiff's authorization," and thereby concealed from the courts that the defendants—the lawyers behind the lawsuits—not only controlled the Plaintiff and therefore had a significant personal stake in the outcome of the litigation, but also had colluded to infringe their own copyrights by impliedly authorizing BitTorrent users to

download the movies. Defendants also caused false representations to be made to the court in these lawsuits by alleging that Ingenuity 13 had suffered damages as a result of the John Does' conduct, when in fact the John Does' conduct had been the entire purpose of Ingenuity 13's existence.

## Defendants Invent Hacking Allegations

Beginning in or about October 2012, after courts had begun limiting the discovery defendants could obtain through copyright infringement lawsuits, STEELE and Hansmeier caused lawsuits to be filed, generally on behalf of Guava LLC, falsely alleging that their client's computer systems had been "hacked," and that certain John Does used "hacked usernames/passwords to gain unlawful access to the member's section of [the client]'s website." The entirety of defendants' hacking lawsuits was a lie. In fact, Guava (and defendants' other phony clients) had no computer systems; they were sham entities created and controlled by the defendants for the sole purpose of obtaining lawsuit settlements.

After the Guava lawsuits were filed, defendants caused motions for early discovery to be filed which sought subscriber information associated with certain IP Addresses that had supposedly gained illegal access to Guava's computer systems. In fact, and as defendants knew, the IP Addresses listed in the Guava complaints and motions for early discovery were IP Addresses that defendants had caught downloading their or their clients' pornographic movies through file-sharing websites on earlier occasions.

In order to attempt to make the Guava lawsuits go smoothly and avoid difficult questions by the court, STEELE and Hansmeier also recruited one or more ruse defendants.

10

The ruse defendants had been caught downloading one of STEELE and Hansmeier's clients' movies from a file-sharing website.   The ruse defendants agreed that, in exchange for STEELE and Hansmeier waiving a settlement payment, the ruse defendant would be sued and permit STEELE and Hansmeier to seek discovery about his/her supposed "co-conspirators."   As defendants knew, the ruse defendants had not participated in any hacking activity, nor had they entered Guava's computer systems with hacked usernames and passwords.   In fact, they had downloaded movies belonging to an entirely different entity.   Nonetheless, STEELE and Hansmeier brought several lawsuits against these fictitious defendants and falsely alleged that they had participated and/or benefitted from a non-existent cabal of hackers in order to attempt to obtain authority from the court to issue subpoenas to internet service providers to find additional people who they could extort.

### Courts Accuse the Defendants of Deception and <u>Defendants Lie to Cover Up Their Fraud</u>

In or about early 2013, courts began scrutinizing the defendant's litigation tactics. Upon uncovering certain of the facts described above, courts began denying the defendants' requests to subpoena internet service providers, dismissing lawsuits that defendants had caused to be filed, accusing the defendants and their associates of deceptive and fraudulent behavior, and imposing sanctions against the defendants and their associates as a result of their misconduct.   For example, on or about May 6, 2013, the District Court for the Central District of California issued an order imposing sanctions against the defendants, and found that:

> Plaintiffs [including STEELE and Hansmeier] have demonstrated their willingness to deceive not just this Court, but other courts where they have appeared.   Plaintiffs' representations about their operations, relationships, and financial interests have varied from feigned ignorance to misstatements to outright lies.   But this deception was calculated so that the Court would grant Plaintiff's early-discovery requests, thereby allowing Plaintiffs to identify defendants and exact settlement proceeds from them.   With these granted requests, Plaintiffs borrow the authority of the Court to pressure settlement.

The Court imposed monetary sanctions in the form of awarding attorneys' fees to the opposing party, referred STEELE and Hansmeier to their respective state attorney disciplinary bodies, and notified all judges overseeing other copyright infringement cases filed by the defendants and their associated entities of the Court's findings.

In order to evade detection, further their scheme, and protect the illicit profits they had obtained, defendants repeatedly lied and caused others to lie, including but not limited to the following:

a.    On or about November 27, 2012, the defendants caused M.L. to attend a hearing in Sunlust Pictures LLC v. Tuan Nguyen, 12-cv-1685 (M.D. Fla), and purport to be the corporate representative of Sunlust Pictures.   During the hearing, M.L. falsely and misleadingly testified under oath that he did not know P.D., when in fact he did, and was attending the hearing at the request of a woman named Sunny Leone when, in fact, STEELE had asked M.L. to attend the hearing.

b.    On or about November 29, 2012, M.L. was deposed in Guava LLC v. Skylar Case, 2012 L 7363 (Cook Cty. Cir. Ct.), and the defendants caused M.L. to falsely

12

and misleadingly testify under oath that: (i) he was the VP in charge of legal matters for Guava; and (ii) Guava maintained computer systems that were "regularly" accessed by hackers, when in fact Guava was a shell company, M.L. had no real involvement with Guava, and the defendants had simply invented the hacking allegations in the complaint.

      c.      On or about January 25, 2013, in a hearing in Guava LLC v. Spencer Merkel, 27-cv-1220976 (Henn. Cty. Dist. Ct.), STEELE falsely and misleadingly informed the court that Guava had "some computer equipment" in Illinois and Las Vegas and that certain unknown "John Does" had hacked into the computer equipment, when in fact Guava was a shell company and the defendants had simply invented the hacking allegations in the complaint.  In the same hearing, STEELE falsely and misleadingly denied that the defendants had reached a "deal" with Merkel whereby in exchange for the defendants waiving Merkel's payment of any settlement fee, Merkel had agreed to be sued so that the defendants could conduct discovery.

      d.      On or about February 27, 2013, defendants caused M.L. to sign a declaration "under penalty of perjury," later filed in AF Holdings LLC v. Andrew Magsumbol, 12-cv-4221 (N.D. Cal.), falsely and misleadingly representing that he was the "CEO" of AF Holdings when, in fact, M.L. was nothing more than a figurehead used by the defendants to disguise their involvement with AF Holdings.

      e.      On or about March 6, 2013, Hansmeier was deposed in AF Holdings v. Joe Navasca, 12-cv-2396 (N.D. Cal.), and falsely and misleadingly testified under oath that he had never worked for and had little association with Prenda Law, and that he was

not involved in Prenda's finances.  In fact, Hansmeier, along with STEELE, exerted substantial control over Prenda Law as well as its finances.  Hansmeier further falsely and misleadingly testified that M.L. was responsible for creating AF Holdings, M.L. was the sole employee and manager of AF Holdings, M.L. was the person responsible for making "litigation decisions," and that "the marching orders come from" M.L., when in fact STEELE and Hansmeier caused AF Holdings to be created, and controlled and made decisions on behalf of AF Holdings.  Hansmeier also falsely and misleadingly testified that the purpose of the copyright litigation brought on behalf of AF Holdings was not profit but "to generate a deterrent effect in stealing [AF Holdings'] copyrighted works," when in fact the purpose of the litigation was to generate a profit for STEELE and Hansmeier and the copyrighted works were never made publically available for purchase by AF Holdings.

      f.    On or about May 2, 2013, STEELE and Hansmeier caused M.L. to sign an affidavit "under penalty of perjury," later filed in AF Holdings v. Joe Navasca, 12-cv-2396 (N.D. Cal.), falsely and misleadingly claiming that M.L. "manage[d] various adult content related companies, including AF Holdings LLC," when in fact STEELE and Hansmeier controlled AF Holdings.  The defendants further caused M.L. to falsely and misleadingly represent that—as representative of AF Holdings—he previously signed documents certifying that he reviewed Alternative Dispute Resolution policies with the name "Salt Marsh" when, in fact, M.L. neither reviewed any such policies nor signed the certifications as "Salt Marsh."

g.    On or about May 28, 2013, STEELE signed an affidavit "under penalty of perjury," later filed in AF Holdings v. John Does, 12-cv-1445-49 (D. Min.), wherein he falsely and misleadingly stated that he merely introduced A.C. to M.L. and that thereafter his "understanding" was that A.C. "participated in a limited number of transactions in 2011 with [M.L.]'s companies," when in fact STEELE used A.C. and M.L.'s names to disguise his control over AF Holdings and Ingenuity 13, and at all relevant times controlled those companies.

h.    On or about July 8, 2013, STEELE filed a complaint and caused M.L. to file a complaint with the State Bar of California against B.G., an attorney hired by STEELE and Hansmeier to oversee copyright litigation on behalf of Prenda Law, wherein STEELE falsely and misleadingly claimed (and caused M.L. to claim) that M.L. was the manager of AF Holdings when, in fact, M.L. was merely a figurehead to obscure STEELE and Hansmeier's control over AF Holdings.  STEELE further falsely and misleading alleged in the bar complaints that B.G. was the primary attorney for AF Holdings, thereby falsely minimizing STEELE and Hansmeier's affiliation with and control over AF Holdings.

i.    On or about August 26, 2013, the defendants caused M.L. to sign an affidavit "under penalty of perjury," later filed in AF Holdings v. John Does, 12-cv-1445-49 (D. Min.), wherein M.L. falsely and misleadingly represented that the membership interests in AF Holdings are held in a trust named "Salt Marsh," whose sole beneficiaries are M.L.'s unborn children, and that M.L. was AF Holdings' managing member.  In fact,

AF Holdings was controlled by STEELE and Hansmeier, and M.L. merely served as a nominee to conceal the defendant's interest in AF Holdings.

        j.      On or about August 27, 2013, STEELE and Hansmeier caused M.L. to sign a notarized declaration "under penalty of perjury," later filed in AF Holdings v. Joe Navasca, 12-cv-2396 (N.D. Cal.), falsely and misleadingly declaring: (i) M.L. formed AF Holdings in mid-2011; (ii) that he was "the only manager" that AF Holdings, LLC ever had; (iii) that "[n]either John Steele, [P.D.] nor Paul Hansmeier ever served as a director, officer, manager, or employee of AF Holdings or otherwise possessed managerial authority or an ownership interest in AF Holdings"; and (iv) that "[t]he only role that Steele, [P.D.] and Hansmeier have played with respect to AF Holdings, LLC is that of its attorney."  In fact, STEELE and Hansmeier created AF Holdings and were at all relevant times the *de facto* owners of and controlled AF Holdings.  In the same declaration, STEELE and Hansmeier caused M.L. to falsely and misleadingly declare that he started AF Holdings because (i) he "believed that [he] could purchase copyrights for little-to-nothing, retain attorneys to ward off the piracy and then resell the copyrights for a profit"; (ii) that "[t]he copyrights [AF Holdings] held would be worth significant sums if even a reasonable percentage of the people who stole the content instead purchased it"; and (iii) that litigation was simply "a necessary evil," when in fact, the copyrights owned by AF Holdings were obtained for the sole purpose of litigation and the copyrighted works were never made publically available for purchase by AF Holdings.

k.      On or about August 28, 2013, Hansmeier signed a declaration "under penalty of perjury," later filed in AF Holdings v. Joe Navasca, 12-cv-2396 (N.D. Cal.), falsely and misleadingly claiming that "I have never served as a director, officer, manager, or employee of AF Holdings or otherwise possessed managerial authority over or an ownership interest in AF Holdings" when in fact STEELE and Hansmeier owned and controlled AF Holdings.  In the same declaration, Hansmeier falsely and misleadingly claimed that "I have never created a Pirate Bay account in my life and categorically deny ever uploading and/or downloading any BitTorrent files of any past client of mine, including AF Holdings" when in fact Hansmeier caused P.H. to upload their purported clients' pornographic movies to BitTorrent file-sharing websites.

l.      On or about September 30, 2013, STEELE falsely and misleadingly testified under oath at a hearing in AF Holdings v. John Does, 12-cv-1445-49 (D. Minn.) that M.L. was the "controlling member" of AF Holdings, and that A.C. had spoken to and given permission to M.L. for AF Holdings to use A.C.'s name on a copyright transfer document. STEELE further testified, falsely and misleadingly, that he had "no ownership interest, never had, in Prenda Law.  I didn't set up a company, bogus or otherwise, AF Holdings." In fact, STEELE and Hansmeier exerted control over AF Holdings and Prenda Law, and M.L. was a pawn used by STEELE and Hansmeier to conceal their involvement in the scheme.   During this hearing, Hansmeier (acting as an attorney for AF Holdings) asked questions of STEELE and thereby suborned the perjury set forth above.

m.     On or about January 28, 2014, STEELE caused M.L. to falsely and misleadingly testify under oath in a hearing in AF Holdings v. Rajesh Patel, 12-cv-262 (N.D. Ga.), that he was the "trustee" and "owner" of AF Holdings, and that STEELE and Hansmeier did not own any part of AF Holdings.  M.L. further falsely and misleadingly described B.G. and P.D. as primarily responsible for Prenda Law's copyright litigation, and falsely downplayed STEELE and Hansmeier's role in AF Holdings and in the related copyright litigation.

n.     On or about April 8, 2015, STEELE falsely and misleadingly testified under oath in a deposition in Alan Cooper v. John Steele et al., 27-cv-13-3463 (Henn. Cty Dist. Ct.), that: (a) "I did not run or manage in any way AF Holdings;" (b) M.L. "operates" AF Holdings; and M.L. "runs" Guava LLC.  In fact, STEELE and Hansmeier managed, operated, and controlled AF Holdings and Guava LLC.

In total, between 2010 and 2014, defendants and their entities received more than $6,000,000 in copyright infringement settlement payments, and caused losses totaling at least $3,000,000.

In or about 2012, the defendants created a company, Under the Bridge Consulting, that they intended to and did use to collect "consulting fees" after transferring the operations of Steele Hansmeier PLLC to P.D. (through Prenda Law).  The defendants thereafter transferred approximately $1,000,000 of the proceeds of the fraudulent scheme to Under the Bridge Consulting, and distributed those monies to Hansmeier and STEELE. The defendants' use of Under the Bridge Consulting was designed in whole or in part to

18

conceal or disguise the nature, source, ownership, and control of the proceeds of their fraudulent scheme.

     3.    **Statutory Penalties**. The defendant understands that the maximum statutory penalty for violation of 18 U.S.C. § 1349 is as follows:

        a.    a term of imprisonment of up to 20 years;

        b.    a criminal fine of up to $250,000.00 or twice the gross gain or loss, whichever is greater;

        c.    a term of supervised release of up to five years;

        d.    a special assessment of $100.00, which is payable to the Clerk of Court prior to sentencing; and

        e.    the costs of prosecution (as defined in 28 U.S.C. § 1918(b) and 1920).

The defendant understands that the maximum statutory penalty for a violation of 18 U.S.C. § 1956(h) is as follows:

        a.    a term of imprisonment of up to 20 years;

        b.    a criminal fine of up to $500,000.00 or twice the gross gain or loss, whichever is greater;

        c.    a term of supervised release of up to five years;

        d.    a special assessment of $100.00, which is payable to the Clerk of Court prior to sentencing; and

        e.    the costs of prosecution (as defined in 28 U.S.C. § 1918(b) and 1920).

     4.    **Revocation of Supervised Release**.   The defendant understands that, if he were to violate any condition of supervised release, he could be sentenced to an additional

term of imprisonment up to the length of the original supervised release term, subject to the statutory maximums set forth in 18 U.S.C. § 3583.

     5.    **Guideline Calculations**.    The parties acknowledge that the defendant will be sentenced in accordance with 18 U.S.C. § 3551, et seq.   The parties also acknowledge that the Court will consider the United States Sentencing Guidelines to determine the appropriate sentence and stipulate to the following guideline calculations:

    a.    <u>Base Offense Level</u>. The parties agree and stipulate that appropriate Guidelines section for Count 1 is § 2B1.1, and the base offense level is 7.  (U.S.S.G. § 2B1.1(a)(1)).

    b.    <u>Specific Offense Characteristics</u>.

        (1)    <u>Loss</u>.  The parties agree that, based on the facts available to the government, the loss resulting from the offense of conviction is between $1,500,000 and $3,500,000, and therefore the base offense level should be increased by 16 levels.    (U.S.S.G. § 2B1.1(b)(1)(I)).

        (2)    <u>Number of Victims</u>.   The parties agree that the offense involved 10 or more victims, and therefore the offense level should be increased by 2 levels.  (U.S.S.G. § 2B1.1(b)(2)(A)).

        (3)    <u>Sophisticated Means</u>.   The parties agree that the offense involved the use of sophisticated means and the defendant intentionally engaged in and caused the conduct constituting sophisticated means, and therefore the offense level should be increased by 2 levels.  (U.S.S.G. § 2B1.1(b)(10)(C)).

    c.    <u>Chapter Three Adjustments</u>.

        (1)    <u>Aggravating Role</u>.  The parties agree that the defendant was an organizer, leader, manager, or supervisor of the criminal activity,

and therefore the offense level should be increased by 2 levels. (U.S.S.G. § 3B1.1(c)).

(2)     Abuse of Trust.  The parties agree that the defendant abused a position of public or private trust in a manner that significantly facilitated the commission or concealment of the offense, and the offense level should therefore be increased by 2 levels.  (U.S.S.G. § 3B1.3).

(3)     Obstruction of Justice.  The parties agree that the defendant willfully obstructed or impeded the administration of justice with respect to the investigation of the offense of conviction and relevant conduct, and the offense level should therefore be increased by 2 levels.  (U.S.S.G. § 3C1.1).

(4)     Guidelines Calculations for Money Laundering Offense.  The parties agree that the offense level for Count 17 is 29 pursuant to U.S.S.G. § 2S1.1(a)(1) and (b)(2)(B).   The parties agree that none of the Chapter Three enhancements are applicable to conduct comprising Count 17, and therefore the total offense level would remain at level 29.  As a result, pursuant to U.S.S.G. § 3D1.3(a), because the offense level for Count 17 (29) is less than the offense level for Count 1 (33), the offense level would be the higher of the two offense levels (33).

(5)     Acceptance of Responsibility.  Notwithstanding the applicability of U.S.S.G. § 3C1.1, in exchange for the defendant's plea and provided that the defendant does not falsely deny any offense or relevant conduct, the government agrees to recommend that the defendant receive a 2-level reduction for acceptance of responsibility and to make any appropriate motions with the Court.  However, the defendant understands and agrees that this recommendation is conditioned upon the following: (i) the defendant testifies truthfully during the change of plea hearing, (ii) the defendant cooperates with the Probation Office in the pre-sentence investigation, (iii) the defendant commits no further acts inconsistent with acceptance of responsibility, and (iv) the defendant complies with this agreement, fully identifies all assets and makes good faith efforts to make restitution to his victims.  (U.S.S.G. § 3E1.1).  The defendant timely notified the government of his intent to plead guilty, and therefore the government will make a motion to reduce the offense level by an additional 1 point pursuant to U.S.S.G. § 3E1.1(b).

21

c.  Other Enhancements/Adjustments. The parties agree that, based on the information available at this time, there are no other applicable enhancements or adjustments to the offense level.

d.  Criminal History Category. Based on information available at this time, the parties believe that the defendant's criminal history category is I. This does not constitute a stipulation, but a belief based on an assessment of the information currently known. Defendant's actual criminal history and related status will be determined by the Court based on the information presented in the Presentence Report and by the parties at the time of sentencing.

e.  Guideline Range. If the adjusted offense level is **30**, and the criminal history category is **I**, the Sentencing Guidelines range is **97-121 months** imprisonment.

f.  Fine Range. If the adjusted offense level is 30, the fine range is $30,000 to $300,000.   (U.S.S.G. § 5E1.2(c)(3)).

g.  Supervised Release. The Sentencing Guidelines require a term of supervised release of between two and five years.   (U.S.S.G. § 5D1.2).

h.  Departures and Sentencing Recommendations. The parties reserve the right to make motions for departures or variances from the applicable guideline.

6.   **Discretion of the Court**. The foregoing stipulations are binding on the parties, but do not bind the Court.   The parties understand that the Sentencing Guidelines are advisory and their application is a matter that falls solely within the Court's discretion. The Court may make its own determination regarding the applicable guideline factors and the applicable criminal history category.   The Court may also depart from the applicable guidelines.   If the Court determines that the applicable guideline calculations or the defendant's criminal history category is different from that stated above, the parties may

not withdraw from this agreement, and the defendant will be sentenced pursuant to the Court's determinations.

7.     **Special Assessments**.     The Guidelines require payment of a special assessment in the amount of $100.00 for each felony count of which the defendant is convicted.   U.S.S.G. § 5E1.3.   The defendant agrees to pay the special assessment prior to sentencing.

8.     **Restitution**.     Defendant understands and agrees that the Mandatory Restitution Act, 18 U.S.C. § 3663A, applies and that the Court is required to order the defendant to pay the maximum restitution to the victims of his crimes as provided by law. The defendant understands and agrees that the Court will order him to make restitution for the entire loss caused by his fraud scheme and that the restitution order will not be limited to the counts of conviction.

9.     **Cooperation**.   The defendant has agreed to cooperate with law enforcement in the investigation and prosecution of other individuals.   This cooperation includes but is not limited to providing truthful information to law enforcement agents and testifying truthfully at any trial or other proceeding.   If, in the sole discretion of the United States Attorney's Office, the defendant cooperates fully and truthfully as required by this agreement and thereby renders substantial assistance to the government, the government will, at the time of sentencing, move for a downward departure under 18 U.S.C. § 3553(e) and Guidelines Section 5K1.1.   The government also agrees to make the full extent of the defendant's cooperation known to the Court.   The defendant understands that the

23

government, not the Court, will decide whether the defendant has rendered substantial assistance.

The defendant understands that the Court will determine whether the defendant has cooperated fully and truthfully.   The defendant further understands that the decision to grant or deny the downward departure motion is solely the Court's.   The defendant further understands that there is no guarantee that the Court will grant a motion by the United States for a downward departure or, if a motion for a downward departure is granted, to what degree the Court will depart.  It shall not be a basis for the defendant to withdraw from this plea agreement that the United States elected not to move for a downward departure, that the Court denied the motion of the United States for a downward departure, or that the Court did not depart downward to the extent hoped for by the defendant.

Finally, the defendant understands that the United States is not obligated to accept any tendered cooperation on the defendant's part.  If the United States chooses not to accept tendered cooperation, the defendant will not be rewarded for such tendered cooperation nor will the defendant be allowed to withdraw from the plea agreement because the tendered cooperation was not accepted.

10.   **Waiver of Appeal and Collateral Attack**.   The defendant understands that 18 U.S.C. § 3742 affords the defendant the right to appeal the sentence imposed in this case.  Acknowledging this right, and in exchange for the concessions made by the United States in this plea agreement, the defendant hereby waives all rights conferred by 18 U.S.C. § 3742 to appeal defendant's sentence, unless the sentence exceeds 60 months'

24

imprisonment.   The defendant expressly waives the right to petition under 28 U.S.C.

§ 2255, except for a post-conviction attack based on a claim of ineffective assistance of

counsel.   The defendant has discussed these rights with the defendant's attorney.   The

defendant understands the rights being waived, and the defendant waives these rights

knowingly, intelligently, and voluntarily.

11.   **Complete Agreement**.  This Plea Agreement, along with any agreement signed by the parties before entry of plea, is the entire agreement and understanding between the United States and the defendant.


Date:  March 6, 2017

ANDREW M. LUGER
United States Attorney


BY: _____
BENJAMIN F. LANGNER
DAVID J. MACLAUGHLIN
Assistant U.S. Attorneys
U.S. Attorney's Office – Dist. of MN

BRIAN LEVINE
Assistant United States Attorney
U.S. Department of Justice – CCIPS


Date:  3/6/17

_____
JOHN L. STEELE
Defendant


Date:  3/6/17

_____
MARK EIGLARSH
Attorney for Defendant