```
1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MINNESOTA
2
   ------------------------------------------------------------
3                                      )
    United States of America,          )   File No. 16CR334
4                                      )   (JNE/KMM)(2)
             Plaintiff,                )
5                                      )
    vs.                                )   Minneapolis, Minnesota
6                                      )   July 9, 2019
    John L. Steele,                    )   Courtroom 12W
7                                      )   9:42 a.m.
             Defendant.                )
8  ------------------------------------------------------------
9
             BEFORE THE HONORABLE JOAN N. ERICKSEN
10              UNITED STATES DISTRICT COURT JUDGE
                        (SENTENCING)
11
   APPEARANCES
12   For the Plaintiff:          Assistant U.S. Attorney
                                 BENJAMIN F. LANGNER, AUSA
13                               DAVID J. MACLAUGHLIN, AUSA
                                 300 South Fourth Street
14                               Suite 600
                                 Minneapolis, Minnesota 55415
15
16   For the Defendant:          Law Offices of Mark Eiglarsh
                                 MARK EIGLARSH, ESQ.
17                               4770 Biscayne Boulevard
                                 Suite 610
18                               Miami, FL  33137
19   Court Reporter:             MARIA V. WEINBECK, RMR-FCRR
                                 1005 U.S. Courthouse
20                               300 South Fourth Street
                                 Minneapolis, Minnesota 55415
21
22              Proceedings recorded by mechanical
     stenography; transcript produced by computer.
23
24
25
```

1                    **P R O C E E D I N G S**

2                        **IN OPEN COURT**

3                         **(9:42 a.m.)**

4              THE COURT:  Good morning.  Please be seated.

5              And, counsel, would you identify yourselves for

6       the record?  Start with Mr. Langner.

7              MR. LANGNER:  Good morning, Your Honor.  Ben

8       Langner on behalf of the United States.

9              THE COURT:  And I would pronounce your name, but I

10      can't.  I'll let you do it.

11             MR. EIGLARSH:  Good morning, Your Honor.  Mark

12      Eiglarsh on behalf of Mr. Steele, who is present in court.

13             THE COURT:  Welcome all.  Let's turn our attention

14      to the guideline calculations.  I know that the government

15      is going to make a motion, which I will grant but we do have

16      to address the guidelines first.

17             It looks like the parties are in agreement and

18      that your agreement is essentially the same, I think you

19      might have used an old guideline table, but that your

20      agreement is that the total offense level is 30.  Criminal

21      History Category does turn out to be a 1, which is what was

22      expected, but there's an agreement that it's a 30.  Is that

23      right, Mr. Eiglarsh?

24             MR. EIGLARSH:  That is correct, Your Honor.

25             THE COURT:  Mr. Langner?

1          MR. LANGNER:  Yes, Your Honor.

2          THE COURT:  All right.  So I don't want you to get

3     too alarmed about this, but I don't know that I agree with

4     that, and it has to do with the role in the offense.  And I

5     have read and respect very much the government's desire and

6     commitment not to use any of the defendant's cooperation as

7     part of enhancing the guideline, and for that reason, you

8     all have come to the agreement that there should be a two

9     level as opposed to a four-level enhancement.

10          Okay.  As part of the Court's obligation to make

11    an independent assessment of the propriety of that range, I

12    looked at whether the scheme is otherwise extensive, and I

13    also respect that the full expanse of this vile scheme was

14    made more clear by Mr. Steele's cooperation, correct me if

15    wrong, Mr. Langner, but the cooperation was post-indictment,

16    correct?

17          MR. LANGNER:  That's true, Your Honor.

18          THE COURT:  So the scheme as set out in the

19    indictment qualifies as otherwise extensive.  There are five

20    people named, and I'm not using the number of people and

21    that's because all of the individuals and their roles were

22    laid out by Mr. Steele and that's not to be used against

23    him, but the extensive nature of the scheme, the phony

24    corporations, and all that at least one wasn't a

25    corporation, it was an LLC, but organizations out of Nevis

1       and Saint Kitts, the doubling down on the fraud in this

2       really sneaky and underhanded way after Court started to be

3       critical of the phony lawsuits.  I can't not find that that

4       qualifies as otherwise extensive.

5               So unless you have some strong agreement, I'm

6       going to be granting the government's motion, in any event,

7       so as I said I don't want you to get too alarmed about that,

8       but I don't see how this offense even just looking at the

9       scope charged in the indictment could not be otherwise

10      extensive such as to qualify for the four levels as opposed

11      to the two levels.  So, all right, that is the finding of

12      the Court with respect to the guidelines.

13              So total offense level of 32.  I do grant the

14      three points for acceptance of responsibility and accept all

15      the other calculations in the PSI.  Criminal history

16      category of 1.  That yields a guideline range of 121 to 151,

17      and a fine range of -- I'm going to ask the probation

18      officer to make sure this is right -- I've got 17,500 to

19      $500,000.  Would you let me know if that's wrong?

20              PROBATION OFFICER:  That's correct, Your Honor.

21              THE COURT:  Okay.  Thank you.  And then the one

22      year to three years for supervised release.

23              Mr. Eiglarsh, my practice is normally to hear from

24      defense counsel and then to hear from the prosecutor and

25      then to hear from the defendant if he wants to say anything.

1    We can proceed that way, or in view of the importance of the

2    cooperation motion, maybe it makes sense for me to hear from

3    the prosecutor first.  I'll hear from you in whatever order.

4    I'll let you pick, Mr. Eiglarsh.

5              MR. EIGLARSH:  Whatever the Court's pleasure but

6    prior to hearing from me, my client is eager to speak to the

7    Court, and I would like that to occur before I say anything.

8    So if the government wanted to go and then I just wanted my

9    client to be heard before I speak to the Court.

10             THE COURT:  Well, all right.  We've never done

11   that but there's no reason not to.

12             Mr. Steele, did you want to go first?  The reason

13   I usually have the defendant go afterwards is so you can

14   hear what the lawyers are going to say, but if you want to

15   go now, you can go now.  It's up to you.

16             I've read your statements, but if you'd like to be

17   heard, come on up to the podium and we'll hear from you.

18   It's up to you.

19             Mr. Eiglarsh, do you want to stand with him while

20   he gives his statement or not?

21             MR. EIGLARSH:  I'm sorry, Your Honor?

22             THE COURT:  Did you want to be with your client

23   while he makes his statement?

24             MR. EIGLARSH:  I'm with him, but I'll be seated

25   here.

1          THE COURT:  All right.  Mr. Steele?

2          THE DEFENDANT:  Good morning, Your Honor.  Before

3    I begin my comments, I want to take a moment to apologize to

4    this Court.  I'm sorry.  I'm sorry for the illegal and

5    stupid things that not only I did but that I was aware of

6    and I did not share when I should have, so there's no

7    rationalizing or justifying my actions, obviously.  My ego

8    harmed this very legal system that I swear an oath to.  I

9    stand here today understanding my failure to act

10   appropriately and with virtue.

11          It's interesting exactly actually 11 years ago

12   today, July 9, 2008, I was admitted to the Illinois bar.

13          THE COURT:  Is that right?

14          THE DEFENDANT:  Yeah.

15          THE COURT:  Eleven years to the day?

16          THE DEFENDANT:  To the day.  To the day.  Just one

17   of those oddities I guess.  So it was interesting because I

18   went to law school as a later student.  I was 37.  Then I

19   was raised as a teenager, I spent most of my life in real

20   estate up to that point.  I was renovating homes in Florida

21   and also taught computer classes, and I would say I lived my

22   first 37 years in I guess 39 or so, as an upstanding member

23   of my community.  But, obviously, that changed.

24          So in 2003, my father died unexpectedly, and he

25   said I always wanted you to go to law school, so I proceeded

1    to make the first of I always tell my attorney three stupid

2    decisions that I made that got me here today.

3          I see this word "stupid" and it's just an

4    interesting word because when I was looking at how other

5    people respond to this process, they use words like "wrong",

6    that they did wrong, but I think all of these things that

7    came up and all I could think of is the word "stupid."  I

8    mean I think of certain moments where choices were made, and

9    the only choice that was the only choice I took that I can

10   describe appropriately would be stupid.

11         So, anyways, the first stupid decision I made was

12   I enrolled in law school without having any sense of mission

13   other than making money, other than looking at it as any

14   other profession I had done.  Looking now, obviously, it is

15   a completely different area than what I had done earlier in

16   my life.  As a newly minted attorney in 2008, I didn't

17   really understand the fiduciary duties that I had.  I had

18   taken, I remember going to the MPRD exam, oh, this is

19   another thing I got to knock out on the way to my career.

20         THE COURT:  The professional responsibility?

21         THE DEFENDANT:  Right, right, and instead of

22   saying, wow, this is really important stuff I should take

23   here.  It was like basically studying for any other exam.

24         And the second stupid decision that I made was in

25   April of 2010, it was -- I'll never forget that day.  Sorry.

1          I received a call from Paul Hansmeier about an

2     idea he had to sue pirates who are caught stealing content

3     online.  And regardless of whose idea it was, I was at fault

4     for not exercising good judgment and for all the mistakes

5     that I made afterwards.

6          THE COURT:  Did you know him or was he a voice out

7     of the blue?

8          THE DEFENDANT:  No, he went to law school with me,

9     and he had reached out to multiple people.  In fact, I think

10     all the people that he worked with from Minnesota and

11     whatnot were fellow law students of his.  And, you know, I

12     think of this saying what injures the hive injures the bee,

13     and I look back and I realize, you know, without even

14     realizing what I was harming on this side, I was also

15     harming myself, and I didn't realize I was doing either.  I

16     was just -- I basically was doing what I did to make money.

17          And my third stupid decision when the Court

18     started demanding answers.  You know, I could have taken --

19     well, let's just say -- let me back up.

20          In 2012, I moved back to Miami with the intention

21     of leaving law and returning to real estate.  I made it

22     clear at that point to Hansmeier and others that I did not

23     want to do this litigation, and it was for my own reasons.

24     I, I had, for the last two and a half years, I had damaged

25     my marriage, ruined my reputation.  I was a mess.  I was in

1    a dark place, and I was reaping what I had sowed for sure.

2              Unfortunately, though, the consequences were just

3    beginning.  One of the attorneys that Hansmeier was working

4    with filed a case before Judge Wright that would begin my

5    journey to further disrespect multiple courts, before Judge

6    Wright and other judges, I basically parsed facts, played

7    word games, hid behind the fig leaf that I didn't officially

8    own, companies that I knew they would do whatever me and

9    Hansmeier said to do, and listened to people I shouldn't

10   have listened to.  Again, like I say, as a grown man, it was

11   my judgment to exercise, and failure to do so is the same as

12   doing it, doing it wrong.

13             So I knew all the time that Peter Hansmeier was

14   uploading content and hoping that people would take the

15   content, I knew that, maybe not at the exact moment, but I

16   quickly figured it out and knew directly.  It was many times

17   I could have displayed courage when I was asked to speak

18   before a judge or submit a written answer for something, and

19   I could have told them, you know, like in front of Judge

20   Wright I could have said, you know, what, you know, I was

21   doing it technically correct, but not having candor, you

22   know, and so I could have told the truth in the true sense

23   and then told people what was going on at many different

24   times.  And, you know, there's no high and mighty or really

25   exotic reason.  I just didn't want to be punished.  I just

1    didn't want to face this.  And I know it was a contemptible

2    and inappropriate action for my duty.  I mean I was still an

3    attorney, and I was still not doing what I should be doing.

4         I guess after years of treating everyone as a

5    means to an end, I disregarded people and compared them so

6    hard that I didn't even realize that I had fallen down that

7    slope.

8         So, anyway, in 2016, I was back to building homes

9    and renovating homes in Miami, and I had begun to take some

10   first steps because, yeah, I was in that valley, steps into

11   philosophy, dealing with my future, and also finally therapy

12   to deal with some of my past issues.

13        Then I was arrested, as this Court knows, in

14   December of that year, and I think of what Einstein said

15   about problems and that's that no problem can be solved with

16   a different level of consciousness than what created it.

17   And I know that you're sitting here today and perhaps

18   deciding in some way wanting to know if I'm the same person

19   that I was.

20        So I understand that actions speak louder than

21   words, and I'm sure that very few people get up here and

22   don't apologize for what they've done.  I understand that.

23   I reflected long and hard how am I going to show,

24   demonstrate that I'm not the same person I was six years

25   ago.  And I've had a lot of time to do this thankfully.  I

1    don't think that if, frankly, I was here in 2014 that the

2    Court would have much to go on for my argument that I'm a

3    different person than I am now.

4          So let me just briefly tell you after I was

5    arrested, I hired Mr. Eiglarsh immediately instructing him

6    to reach out to the prosecutor.  That's it.  Let's get in

7    front of him, and, you know, I want to come completely clean

8    with everything.  So I sat down with Mr. Langner and

9    discussed everything I did and others did, some pretty long

10   talks.  Quite frankly, the weight was lifted off my

11   shoulder, and it was actually kind of empowering that this

12   cloud, you know, was just like...

13         It was also surprising because I actually got a

14   better understanding of the extent of certain things while I

15   talked to the prosecutors that I hadn't really, I guess,

16   appropriately considered.  I mean I just didn't.  It's

17   frustrating, I guess, is the only word I'm thinking in my

18   mind right now.

19         So I spent the last two years studying the Prapa

20   philosophy, which I'm not doing a very good job of it right

21   now called stoicism, and I've tried to live a life of

22   virtue.  So as I mentioned in my letter I sent you, I

23   appreciate you including that, by the way, in the PSI

24   report.

25              THE COURT:  We don't have a hard copy of that but

1   that will be filed, your statement will be filed as a

2   document in aid of sentencing.  And unsealed, if it is

3   sealed, it will be unsealed at the conclusion of the

4   hearing, so.

5           THE DEFENDANT:  Okay.

6           THE COURT:  Go ahead and collect yourself.  Do you

7   want a glass of water or anything?

8           THE DEFENDANT:  No, I'm fine.  So my first step,

9   as far as taking concrete actions to show this Court, is I

10  moving my ex-wife and daughter to family near family and

11  renovated a home for them, so that they would have a place

12  to stay.  While I knew that I wasn't going to be able to

13  support them the way that I have always been supporting

14  them, and I've spent the last years working with my sister

15  renovating and working on home remodelling, raising my

16  daughter, and studying.  I've apologized to my family who,

17  obviously, I've hurt, and most tragically, my young

18  daughter.  And I've also written letters to certain federal

19  judges apologizing for my behavior.

20          I have submitted letters of support from family

21  and friends, of course.  They are not here today at my

22  request.  However, I just feel like today is me accepting

23  responsibility for my actions, so.

24          But the letters of support attempt to paint a

25  picture of who I am now versus who I was during my time as

1    an attorney.  I'm close to my family, and I've been living

2    with one of my sister's for the last two years.  This sister

3    has written a letter to the Court and explained that she

4    will assist during and after any transition from my

5    sentence.

6             As I mentioned, I worked in home remodelling prior

7    to my career and after I was arrested.  I plan to continue

8    once I completed my sentence.  The business owner that has

9    gotten to know me over the few years has submitted a letter

10   in my support and offered to bring me aboard after my

11   sentence.  You know, I don't want to be a burden on the

12   community.  I know that I have restitution.  I know that I

13   have this obligation.

14            And I just wanted to kind of wrap it up by saying

15   I understand the first thing that I learned in my studies

16   was to know what I can and can't control.  I look back, and

17   I catch myself wanting to control the past, and I can't

18   control that.  I can't control what I've done and the stupid

19   things I've done and the failures I've done.  All I can

20   control is, obviously, thoughts and actions now and in the

21   future.

22            I was talking about this, Tammy, my pretrial

23   officer, has told me two weeks ago that I'm one of the

24   people that she oversees that she's not worried about coming

25   back or having any kind of parole issues.

1           And I'm thankful to Ben Langner, the prosecutor,

2      for saying encouraging things about me and helping me

3      through this process a little bit.  I know I must be held

4      accountable for my actions I took as an attorney years ago,

5      regardless of where I am now.  I just think it's important

6      that you understand that I've made concrete steps to

7      apologize to the courts that I've hurt.  This is, was harder

8      than I thought.

9           I've already taken whatever steps I can to prepare

10     for my life after prison; but, frankly, when I pay my debt

11     to society, I want to re-enter that society.  I spent a good

12     portion of my life being a soccer dad, doing all that stuff.

13     You know, this is, obviously, a bad period that I take

14     responsibility for, but, you know, I, moving forward, I want

15     to return to being that person that I am, that I know I can

16     be.

17          Thanks for listening to me today.  I appreciate

18     putting up with me, and I just think it's a good, it's

19     important that I sort of stand here and look at you and

20     apologize.  Thank you.

21          THE COURT:  Thank you.  Just hold on one second.

22     I just want to let you know that you did say one thing that

23     bothers me, and I'm going to give you a chance to respond to

24     it, if you want.  And I'm happy to address this to your

25     lawyer if you choose, but the reference to your statements

1    to the federal courts being technically correct.  I

2    understand maybe that you were talking about some of the

3    representations with respect to nonpersonal ownership of

4    corporations, but I just want to understand whether you're

5    claiming that all your statements to courts were technically

6    correct.

7            THE DEFENDANT:  No, of course not.

8            THE COURT:  As opposed to an injurious nature, and

9    I don't think that's what you mean, but I just want to clear

10   the air on that.  I don't want to, on some level, hold it

11   against you that you are claiming that your statements were

12   technically correct when some were, but mostly they weren't.

13           THE DEFENDANT:  No, actually they were worse than

14   technically incorrect because I knew that by having helped

15   set up these companies and not having my name on them, I

16   could later be technically accurate in the sense of saying I

17   didn't own something when I did, but -- the other things,

18   yes, I was not correct in any inference that I was trying to

19   hedge my bets that I was somehow respecting the Courts in

20   this process, no.

21           THE COURT:  Okay.  All right.  Okay, thank you

22   very much.  I appreciate it.

23           Mr. Langner?

24           MR. LANGNER:  Your Honor, the government is moving

25   under 5K for the Court to reduce Mr. Steele's sentence for

1   his cooperation with the government.  And we submitted a

2   motion, but we also submitted I think a fairly detailed

3   letter to the Court that laid out in more detail just a few

4   of the things I'm going to cover more briefly today.  But I

5   think the thing that is most significant to the government,

6   and this goes to the 5K but it also just goes to 3553 is

7   there was a significant, a stark difference in the way that

8   Mr. Steele handled being charged with a crime and the way

9   that Mr. Hansmeier dealt with being charged with a crime.

10          The first and foremost of those, which is,

11   obviously, the subject of our 5K motion is that Mr. Steele

12   cooperated with the government.  He provided detailed

13   information to us, laid out everything about this scheme

14   from start to finish, didn't hesitate to provide any

15   information that we asked for.  And I think his cooperation,

16   his willingness to testify, the detailed statement that he

17   gave to us that we provided to Mr. Hansmeier not long before

18   he pled guilty, I think, was the dominant factor in getting

19   Mr. Hansmeier to plead guilty.

20          Obviously, there was other evidence.  We had, I

21   think, a strong case, but Mr. Steele's position on the

22   government's side in cooperating and being willing to

23   testify, I think, was a very significant factor in that

24   guilty plea.

25          The second, I think, very significant difference

1      between Mr. Steele and Mr. Hansmeier is that Mr. Steele

2      fully admitted his guilt.  You know, immediately after being

3      charged, I got a call from Mr. Eiglarsh saying my client

4      wants to come in and meet with you and tell you everything.

5      And I think, you know, initially I even told him maybe you

6      want to take a little time because it's going to waste

7      everybody's time if he comes in and isn't fully on board

8      with the truth.

9             But he came in, and I mean I've been doing this

10     for 13 years now, and I got to say particularly for white

11     collar defendants, it's rare for somebody to come in and

12     really fully acknowledge what they did in the first go

13     around, and Mr. Steele did that.

14            You know, I know he's nervous today, and so it may

15     not come through in the same way, but he really did

16     acknowledge that he was wrong, that these things were wrong,

17     that he lied to courts.  And, you know, everybody tried to

18     explain why they did things but, ultimately, his willingness

19     to say yes, this was wrong, that was wrong, I knew that, you

20     know, this wasn't a mistake.  Even if something was

21     technically correct, it's my fault for not correcting it

22     with the Court.  He really did do that and whether or not

23     that came through in what he just said, I can tell the Court

24     that I thought he was very truthful with us in a way that I

25     think is unique for a defendant in that position,

1    particularly for a significantly educated white collar

2    defendant.  Sometimes I find those defendants have the

3    hardest time telling the truth the first time.

4           And I think the third thing, and maybe even the

5    most significant is unlike Mr. Hansmeier, Mr. Steele has

6    expressed regret and remorse for what he did.  The Court has

7    now heard from Mr. Hansmeier, and now heard from Mr. Steele,

8    and I think there is a significant difference in the way

9    that they spoke to the Court and acknowledged what they did

10   wrong.  You know, whether or not Mr. Steele said things

11   exactly right, he has expressed remorse.  Every time he's

12   met with the government, he's gone through and talked about

13   how bad he feels for what he did to the court system and to

14   the defendant -- to the victims in this case.

15          So I also think based on, you know, the way

16   they've handed this case, that Mr. Hansmeier presents a much

17   higher risk of recidivism and engaging in future fraudulent

18   conduct.  I don't think Mr. Steele does.  I think that this

19   process hasn't truly changed him.  And, you know, obviously

20   you can't eliminate that risk, but I do think it's

21   significantly less with Mr. Steele than it is with

22   Mr. Hansmeier.

23          And so the government's recommendation, Your

24   Honor, is a sentence of 60 months.  And although the

25   government's guideline range that we sort of initially

1    derived that from is not the one that the Court ultimately

2    found, I do think 60 months, a 50 percent departure from the

3    guideline range that the Court has in front of it, is not an

4    unwarranted disparity.

5            As I said, there are significant differences

6    between these two defendants, and that 50 percent would be

7    in line with somebody who maybe testified at trial.  But the

8    only reason Mr. Steele didn't get to testify at trial is

9    because he did his job in the first instance and came in,

10   provided a truthful statement and was ready to testify.

11           THE COURT:  I mean there are problems with the

12   percentage anyway because that goes back to treating the

13   guidelines mechanistically, which they are not to be anyway.

14           MR. LANGNER:  That's true, Your Honor.

15           THE COURT:  I've never been for mathematical

16   calculation on the guidelines.  I appreciate that your

17   office sometimes has to justify your request that way, but I

18   don't think in terms of that only because the starting point

19   is not as fixed as that calculation assumes.  But anyway

20   that's all by way of saying that I respect your

21   recommendation.

22           MR. LANGNER:  Very good, Your Honor.  The last

23   thing I'd say is, obviously, we ask that restitution be set

24   in this case consistent with the same restitution for

25   Mr. Hansmeier.  And I believe that amount was --

```
1            THE COURT:  I've got it.  It was the last thing I
2     looked up, and that's why I wasn't on the bench right
3     immediately at 9:30.  Tell me if this is right:
4     $1,541,527.37.
5            MR. LANGNER:  I believe that's correct, Your
6     Honor.  Wait, I'm sorry.
7            THE COURT:  What do you have?
8            MR. LANGNER:  I have $1,505,927.37.
9            (Off the record discussion between prosecutor and
10    probation officer.)
11           MR. LANGNER:  The probation officer reminded me
12    that I was not including one of the two exhibits.  I think
13    the Court's number is correct.  My number was based only on
14    Exhibit 1 for Mr. Hansmeier's sentencing, not Exhibit 1 and
15    Exhibit 2.
16           THE COURT:  And is restitution still open?  Are
17    you still asking for more?  Do you want to have it left
18    open?  Are you content to impose joint and several on that
19    same amount?
20           MR. LANGNER:  Your Honor, I guess I would prefer
21    to impose it at this time.  If there's a need to amend it,
22    we have gotten some additional stuff that's come in.  We're
23    going to review that.  There may be a point in time where we
24    make a motion to amend it if we feel like it's appropriate.
25           We also, according to the Court's instruction to us
```

1    last time, we're going to be sending letters to allow people

2    to opt out.  So if there's a need to amend it, we could do

3    that in one motion with the Court, and I would rather just

4    enter it at this time.

5              THE COURT:  I'll hear what Mr. Eiglarsh's

6    preferences are on that, but that certainly makes sense to

7    me.  Thank you so much, Mr. Langner.  I appreciate it.

8              MR. LANGNER:  Thank you, Your Honor.

9              THE COURT:  Mr. Eiglarsh?  Welcome.

10             MR. EIGLARSH:  Thank you, Your Honor.  And

11   regarding that restitution issue, whatever the government

12   recommended is fine.

13             THE COURT:  Okay.

14             MR. EIGLARSH:  I thank you for the opportunity to

15   address the Court.  I took the time to actually carefully

16   craft my words because I didn't want there to be any

17   regrets.  I have a lot of thoughts about this case, and the

18   first thing that I wanted to say is I agree with my client's

19   assessment that his actions were stupid.  I don't love that

20   word, but it was definitely very stupid for very bright

21   guys.

22             Several other words do come to mind like:

23   Reprehensible, abhorrent and criminal.  I've been practicing

24   in State and Federal court for 26 years.  And there's a

25   tarnish, there's a stain left by the actions of both him and

1    the co-defendant, and I take that very personally.  I've

2    expressed that to my client.  I'm not going to try to spin

3    what he did at all.  He deserves to be punished.  What I

4    will offer is solely mitigation.  That's it.

5            Although, I've been practicing for 26 years, I

6    have to say that this sentencing is very challenging to me

7    personally.  I wish I didn't like John as much as I do.

8    I've gotten to know him, and he has evolved since 2017.

9    Like I get to see what he's like when he's not at the

10   podium.  I get to talk to him constantly.  I get to meet

11   with him.  He's become a friend, and I truly admire the work

12   that he has done on himself personally over the years and

13   also the work that he's done in this case for the

14   government.

15           I've seen the changes first hand.  The sentence

16   that the government is recommending to the Court, the

17   60 months I believe is a very fair one under the

18   circumstances.  His substantial assistance, as the

19   government maintains correctly, was essential to secure the

20   convictions against the co-defendant Paul Hansmeier in this

21   case.

22           After my client was indicted, I explained to him

23   here's my typical procedure.  We don't do anything until we

24   get all of the evidence from the government.  I will

25   thoroughly evaluate each and every piece of evidence and see

1    whether they can prove every single charge, every element of

2    the charge, and see whether there's even motions we can

3    file.  He wasn't interested.  John, it was almost like he

4    wanted to go to confession.  I got to get to the table.  He

5    was the one who pushed me to call Mr. Langner, not the other

6    one around, and get him to the table.

7             He was very eager to accept responsibility for

8    what he had done.  And I remember Mr. Langner reminded me of

9    those conversations, Mark, are you sure if you need more

10   time, because Mr. Langner was reminding me of so many of

11   those clients who they say they're ready, but they'll tip

12   their kind of, put their toe in the water, right?  We start

13   and then the government says get out of here.  You know, go

14   tell your client he's got to jump in.  He jumped in head

15   first.

16            I remember how uncomfortable I was sitting at the

17   table.  I didn't even know what all the evidence was, and

18   all of us, and I'm referring to the agents who are here.

19   There were additional agents, additional prosecutors, a room

20   full of strangers, big conference room table, and my client

21   in detail with no lying in him whatsoever answer everything.

22   I mean everything.  A lot of times, we're like, "Wait,

23   what?"  It was fascinating, and that all came from him and

24   his willingness to speak in detail with no reservations and

25   no guarantees at all.  Nothing.

1          He did ask like, well, what does this mean as far

2     as my sentence?  He asked just informally.  I said there's

3     no guarantees at all.  In fact, you can give all this

4     assistance, and if they don't deem it substantial, you get

5     nothing, and then it depends on how they evaluate it.

6          So he participated in multiple interviews with the

7     government beginning in early 2017 and continuing until his

8     co-defendant Hansmeier was sentenced.  The government

9     accurately described my client's participation in these

10     debriefings when they say that Mr. Steele provided an

11     accurate, detailed and unvarnished account of the scheme

12     that he perpetrated with Mr. Hansmeier.  There was no lying

13     in him ever.

14          Now, Hansmeier finally pled guilty only after

15     receiving the government's Jencks material a month before

16     trial, which included a 14-page memorandum describing the

17     initial interview of John Steele.  The admissions that

18     Mr. Steele made during all of his debriefings, I believe,

19     made it possible -- actually it was impossible now for

20     Hansmeier to continue to claim this bogus claim that he

21     proceeded in good faith.  Eleven days after receiving the

22     Jencks material, Hansmeier pled guilty on August 17, 2018.

23     My client was ready, willing, able and eager to testify

24     against Hansmeier at his trial and Hansmeier knew that.

25          Now, Judge, it's important also to note the kind

1    of relationship that Steele and Hansmeier had.  You had

2    asked him, well, wait, how did you know each other?  From

3    law school.  That was a friendship, a very close friendship

4    that never changed.

5           And the reason why I bring that up is, you know, a

6    lot of times I'm representing these guys, and they have a

7    falling out or there was never much love between the guys in

8    the conspiracy, and it's easy for them to testify against

9    the co-defendant.  This was a close relationship that was

10   developed over so many years.

11          Although, my client actually never expressed it, I

12   know that he likely found his cooperation more challenging

13   in light of the special bond that they had.  It's important

14   to note that.  The government accurately states that

15   Hansmeier likely felt betrayed by Steele's decision to plead

16   guilty and cooperate with the government.  The significant

17   disparity in their sentences is warranted in large part

18   because of the drastic difference in the way the two men

19   responded to their indictments.  The government just

20   highlighted it.  I want to make an important point about

21   that.

22          John immediately and wholeheartedly accepted

23   responsibility, provided substantial assistance.  He has

24   expressed true remorse and regret for his prior conduct.

25   Hansmeier, on the other hand, he refused to accept

1    responsibility.  He wouldn't apologize for defrauding courts

2    throughout the country, and he continued to conceal and hide

3    assets through a fraudulent bankruptcy and so much more.

4            I want to briefly discuss my client's abusive

5    childhood not at all to appeal to sympathy.  That would be

6    transparent and that's not who I am.  As noted in the PSI,

7    Mr. Steele experienced severe childhood physical and

8    emotional abuse at the hands of his parents.  I've had

9    numerous private conversations with him to get to the core

10   of who he is, and there were real tears flowing from his

11   eyes when he talked about the detail, which I'm not going to

12   get into in open court, but the detail of specifically what

13   his mother did to him as a child.  To this day, he struggles

14   daily to cope with the trauma that he experienced at such a

15   young age.

16           Without question, the abuse that he suffered

17   significantly affected the person that he became.  It then

18   significantly impacted the choices that he made in his adult

19   life.  Since he didn't get his parents unconditional love

20   and approval, he sought to bring in happiness and love from

21   the outside in.  That meant, amongst other things, that he

22   believed that bringing in money and people's approval, that

23   was the key to his happiness.

24           He has since learned that happiness is an inside

25   job.  I'm bringing up this childhood trauma not in any way

1    again to invoke sympathy at all or offer any excuse for his

2    behavior, rather the point is that John has learned to love

3    himself unconditionally.  I've seen it firsthand.  I don't

4    know that he demonstrated that fully up here.  I think he

5    was very nervous, and those nervous laughs I think got in

6    the way of him connecting fully candidly to how he really

7    is.  I think that his words that you have in his acceptance

8    of responsibility and what I'm sharing with you

9    authentically that I saw really does kind of reflect who

10   he's become.

11        I believe that because he's learned to love

12   himself and accept who he is unconditionally, he's

13   eliminated the primary root cause for his poor choices.

14   The extensive spiritual work that he has been engaged in

15   will eliminate the chance that he would ever remotely be

16   involved in something like this again.  And the letter I

17   thought that I had filed it, but I filed it last night for

18   sure.

19        THE COURT:  Okay, so it is filed.  I was just

20   wondering -- okay, so it is filed.  I don't have to ask you

21   to give us another copy?

22        MR. EIGLARSH:  I filed it, and it's the letter

23   submitted by his therapist I believe supports the conclusion

24   that his chances of ever being back in front of you or any

25   other judge for any criminal wrongdoing  is --

 1              THE COURT:  I've got the therapist's letter, which

 2      is exactly as you say and then I've, obviously, got the

 3      content here in the PSI of the letter, but the actual letter

 4      is filed.  It's just a technical point.

 5              MR. EIGLARSH:  Yes, I filed it last night.

 6              THE COURT:  Thanks, I didn't mean to get you off

 7      track.

 8              MR. EIGLARSH:  So in terms of punishment, I do

 9      want the Court to know that he has already suffered greatly

10      as a result of his actions.  His marriage crumbled as a

11      result.  And as a result of the divorce, he lost the ability

12      to live in the same home as his daughter.  She's now

13      11 years of age.  That's all he talks about.  It hurts his

14      heart daily he's not able to put her to sleep at night, be

15      there when she wakes up, and always be in the same home with

16      her when she needs him.  He knows he's going to have to do

17      time away from her, but as soon as they can get back

18      together would be ideal.

19              His actions caused him to lose his license to

20      practice law, which was the appropriate thing to do for

21      whoever took his license.  All of his money and assets are

22      gone, including his father's inheritance.  He'll be a

23      convicted felon the rest of his life.

24              Your Honor, as I conclude, I am aware that it's

25      important for the Court to send a message that conduct like

1    Mr. Steele's must be sufficiently punished.  Yet, it's also

2    equally as important to send a message to those who what I

3    consider to be super accept responsibility, who go above and

4    beyond to assist the government, and engage in extensive

5    life altering internal changes should receive ample benefit

6    as well.

7            Some of the specifics, my client is requesting the

8    RDAP program.  It's very important to him.  His history of

9    using at least marijuana and other substances is documented

10   in the PSI.  He would also like to be as close to his

11   daughter as possible.  I had him do some research, and we're

12   recommending either, and the government has no objection to

13   these recommendations, the McKean FPC.  That's going to be

14   15 minutes from where his daughter and his wife live.

15   Alternatively, Lewisburg FPC, that's L-e-w-i-s-b-u-r-g.

16   Both he checked out does have the RDAP program, which he

17   needs and would put him as close as possible to still

18   maintain a relationship with his daughter.

19           We also respectfully request a self-surrender any

20   time after September 1st.  The government doesn't have an

21   objection to that, and the reason is he continues to share

22   time with his wife of his 11-year old daughter, and she goes

23   back to school at the very end of August.  So ideally he

24   would like to spend that time with her and then any time

25   after September 1st.

1       Your Honor, I'd like to thank you on behalf of my

2  client and his family for the time to address you.  I

3  passionately request both personally and professionally that

4  you ratify the government's request of 60 months.  I believe

5  under the circumstances it's more than fair and reasonable.

6  I thank you.

7       THE COURT:  Thank you.  Nice to see you practicing

8  in Minnesota.

9       Mr. Steele, come on up to the podium with your

10  lawyer, please.

11       The crime that you committed was extremely

12  serious.  You abused the court system as you say as a means

13  to your personal end.  The courts are imperfect but yet

14  serve to act as a means to the ends of justice.  They're not

15  a tool in the box of anybody's personal hustle.

16       Both your lawyer and the government lawyer have

17  eloquently spoken about your extraordinary reaction to being

18  charged, and I am convinced by those arguments that you do

19  represent a person who has the opportunity to change.  I

20  don't know that you have changed completely as much as you

21  will in the future, but you certainly made extraordinary

22  strides, and those are to be recognized and will be

23  recognized in the sentence.

24       So on the one hand, we have this cynical and

25  vicious criminal activity.  On the other, we have you as a

1    person with your difficulties and your actions post-arrest,

2    and the fact that even during -- there's really nothing good

3    that can be said about you during the offense except that it

4    wasn't your idea, and you weren't the original mastermind of

5    it.

6           A sentence of 60 months is it's a serious

7    sentence.  It does accomplish the goals of punishment, yet

8    is not too much.  It gives you a chance to resume your life

9    once you're out.  I think that your lawyer has done an

10   outstanding job, I must say, of representing you, and the

11   government's lawyer, who also has done a very good job, have

12   come to a recommendation that is imminently fair and one

13   that I don't disagree with.  So you are sentenced to the

14   custody of the Bureau of Prisons for a period of 60 months.

15   That does represent a granting of the government's motion

16   under 5K.

17          Now, I just want to say one thing about the areas

18   I think you might possibly run into in the future that could

19   cause you trouble, and I'm going to incorporate my thoughts

20   about this into some of the conditions of supervised

21   release.  You have an entrepreneurial streak.  And --

22          THE DEFENDANT:  Yes, Your Honor.

23          THE COURT:  And what worries me is having you have

24   control over anybody's money.  And I know that you started

25   that school, and you've done some nonprofit work.  All of

1    that makes me a little nervous just because even though

2    you're completely genuine in your belief that you've

3    changed.  You'll see in the conditions of supervised release

4    that I don't want you to -- well, I'm going to order that

5    you don't.  You can work with the probation officer if you

6    want to get around this condition, but it has to do with

7    holding positions with fiduciary duties.  So that's why I'm

8    putting that in there.

9                THE DEFENDANT:  I understand.

10               THE COURT:  As a protection, because you might get

11   out and think I need some money.  I want to start a

12   business, and then one thing could possibly -- I'm not

13   saying it would, could potentially lead to another.  We just

14   have to do as much as we can to prevent this or anything

15   remotely similar from happening in the future.

16               So, first, I will order the restitution and that

17   is in the amount that we just talked about, which was

18   $1,541,527.37, joint and several with your co-defendant

19   Mr. Hansmeier.

20               And in case I forget later, you do have to pay a

21   $200 special assessment.  That's one hundred dollars per

22   count of conviction.  As I probably told you at the time of

23   your guilty plea, that money goes to the Crime Victims Fund.

24               I'm going to say two years of supervised release.

25   So on the restitution, you're to make payments of at least

1    one hundred dollars a month over a period of two years

2    starting 30 days after you're released from confinement.

3    Payments are to be made payable to the Clerk of U.S.

4    District Court for disbursement to the victims.

5            I would also say parenthetically you should stop

6    writing letters to judges for apologizing for behavior just

7    because I understand why you're doing it, but I'm telling

8    you not to do it anymore.

9            Over the period of incarceration, you are to make

10   payments of either quarterly installments of at least $25,

11   if you have a non-UNICOR job or at least half of your

12   monthly earnings if you are working a UNICOR job.  And I

13   recommend that you participate in the inmate financial

14   responsibility program while you are incarcerated.

15           Your obligation to pay the full amount of

16   restitution continues even after the term of supervised

17   release has ended and that's pursuant to 18 US Code

18   Section 3613.  If you can't pay the full amount of

19   restitution at the time of the supervised release ends, you

20   may work with the United States Attorney's Office financial

21   litigation unit, colloquially known as the flu to arrange a

22   restitution payment plan.

23           I'm not going to impose a fine.  The $200 special

24   assessment isn't a fine, and I do do that, but I'm not going

25   to impose a fine.  To the extent you have any money, I want

 1    that to go to restitution.

 2           The two years, I should say the 60 months is

 3    concurrent on each of the two counts, and the two years of

 4    supervised release is also concurrent on each of the counts,

 5    so Count 1 and Count 17 to run concurrently.

 6           The following mandatory conditions are applicable:

 7       You must not commit any crimes:  Federal, state, or

 8    local.  You must not unlawfully possess a controlled

 9    substance.  You have to submit to one drug test within

10    15 days of release from imprisonment, and at least two

11    periodic drug tests thereafter as determined by the Court.

12    You must refrain from any unlawful use of a controlled

13    substance.

14           You have to cooperate in the collection of DNA as

15    directed by the probation officer.

16           You have to abide by the standard conditions of

17    supervised release that have been adopted by the Court,

18    including report to the Probation Office in the federal

19    judicial district where you are authorized to reside within

20    72 hours of release from imprisonment, unless the probation

21    officer instructs you to report to a different probation

22    officer or within a different time frame.

23           You must not own or possess or have access to a

24    firearm, ammunition, destructive device or other dangerous

25    weapon.  And you have to comply with the following special

1    conditions:

2            Submit to substance abuse testing as approved and

3    directed by the probation officer.  I know people are

4    sometimes kind of disrespectful of the extent to which

5    marijuana can be an addiction, but so submit to that

6    substance abuse testing.

7            If you're not employed at a regular lawful

8    occupation as deemed appropriate by the probation officer,

9    you may be required to perform up to 20 hours of community

10   service per week until you are employed, and you must also

11   participate in training, counselling, daily job searches or

12   other employment related activities as directed by the

13   probation officer.  Fortunately, it seems like you've got a

14   path to employment, but this is there in case you don't.

15           You have to provide to the probation officer

16   access to any requested financial information and that

17   includes credit reports, credit card bills, bank statements,

18   telephone bills, cable tv bills, anything that's going to

19   show your financial information.

20           You are prohibited from incurring new credit

21   charges or opening additional lines of credit without the

22   prior approval of the probation officer.  And you're not to

23   hold employment with fiduciary responsibilities unless you

24   get prior approval from the probation officer.  So those are

25   the conditions of supervised release.  If you violate them

1    you're going to come back in front of me, and I'm going to

2    have to send you back to prison, so be forewarned.

3              I talked to you about the special assessment

4    already.

5              The remaining counts of the indictment will be

6    dismissed on motion of the United States.

7              MR. LANGNER:  We move to dismiss the remaining

8    counts, Your Honor.

9              THE COURT:  The motion is granted.

10             I will recommend to the Bureau of Prisons that you

11   participate in the Residential Drug Abuse Program.  In terms

12   of placement, I recommend that you be placed at McKean or,

13   secondarily, at Lewisburg.  Those are not idle

14   recommendations.  Those are made on the fact that I have

15   trust and confidence in your lawyer, and I believe your

16   lawyer has done a good and responsible job of investigating

17   what institutions would be appropriate for you.

18             I independently believe that the location of those

19   institutions will assist you in your reintegration into the

20   community once you have finished serving your prison

21   sentence.

22             I have reviewed your record while you were out on

23   release and after some initial stumbles, you have been

24   completely compliant.  That in conjunction with my sense

25   that you will make good use of this time leads me to the

1    very unusual decision that I will give you until

2    September 2nd to self-report.  I'm not saying the 1st,

3    because that's a Sunday.  I might be wrong about that.

4    Yeah, that's a Sunday, so I'm going to say Monday,

5    September 2nd to report.

6              I can't possibly imagine that you won't have been

7    designated to an institution by then but if you haven't,

8    then you are to report to the United States Marshal's Office

9    in -- where are you going to be living?

10             THE DEFENDANT:  Right now I'm in Phoenix, Arizona,

11   but I will be in Pennsylvania at that time because I would

12   be returning my daughter.

13             THE COURT:  I just have to pick a Marshal's office

14   as a backup.  Normally, I would say Minnesota, but that

15   seems stupid to me to come here, speaking of stupid.

16             THE DEFENDANT:  I just know there's a Western

17   District of Pennsylvania.  I don't know if there's a

18   Marshals office there.

19             THE COURT:  I want to know how far away you are

20   from Philadelphia.

21             THE DEFENDANT:  Six hours.  The closest big city

22   would be Erie is medium size and Buffalo, New York, would be

23   the closest big city.

24             THE COURT:  Well, none of this is really going to

25   matter anyway but because you're not in custody, I don't

1    have a marshal here.  Does the FBI know if there's a

2    Marshal's office in Erie?

3              PROBATION OFFICER:  Your Honor, I'm not certain

4    how far but I believe he's closer to the Pittsburgh area,

5    which I would suspect would have a Marshal's office.

6              THE COURT:  There we go.  All right.  Pittsburgh

7    it is.  Okay, we'll say if for some reason you have not been

8    designated to an institution by September 2nd, you are to

9    report by 10 o'clock in the morning to the United States

10   Marshal's Office in Pittsburgh.

11             THE DEFENDANT:  Yes, ma'am.

12             THE COURT:  I know you pled guilty and everything,

13   but I'm still going to tell you your appeal rights.  The

14   Rules of the Court of Appeals provide that any appeal would

15   have to be noticed within 14 days of today's date.  Your

16   lawyer would do that for you.  If you take an appeal and you

17   can't afford a lawyer, then one would be appointed to

18   represent you at no cost.

19             With all of that, I condemn the actions that you

20   took in committing this crime.  I congratulate you, however,

21   on the way that you handled this, and I express my hope and

22   confidence that you will make a good life in the future.

23             And Cathy said the second is Labor Day.  Thank

24   you.  The 3rd, September 3rd.  Everything else is the same,

25   only it's not the 2nd, it's the 3rd.  All right.

 1              Mr. Langner, is that everything?  Or is there

 2      anything else from the government's standpoint?

 3              MR. LANGNER:  I don't believe so, Your Honor.

 4              THE COURT:  Mr. Eiglarsh, how about you?  Anything

 5      else?

 6              MR. EIGLARSH:  No, other than to thank the Court.

 7      Obviously, we're very grateful, and to thank Mr. Langner and

 8      his agents.  They were incredible to work with, extremely

 9      professional, decent people, and I'm just very grateful.

10              THE COURT:  The fact that they were so pleasant to

11      work with probably says a lot about you too.  Thank you.

12              THE DEFENDANT:  Thank you, Your Honor.

13              THE COURT:  We're in recess.

14                  (Court adjourned at 10:41 a.m.)

15

16                      *     *     *

17

18                   **REPORTER'S CERTIFICATE**

19          I, Maria V. Weinbeck, certify that the foregoing is

20      a correct transcript from the record of proceedings in the

21      above-entitled matter.

22

23          Certified by:  *s/ Maria V. Weinbeck*

24                      Maria V. Weinbeck, RMR-FCRR

25